UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | 4:04CR 41 CAS |
| | ) | |
| Plaintiff, | ) | |
| | ) | St. Louis |
| | ) | |
| | ) | |
| BENJAMIN VIETEN, et al, | ) | February 20, 2004 |
| | ) | |
| Defendants. | ) | |

TRANSCRIPT OF MOTION HEARING
BEFORE THE MAGISTRATE THOMAS C. MUMMERT

APPEARANCES:

For the Government: Mr. James Delworth
Assistant U.S. Attorney
111 South 10th Steet
St. Louis, MO 63102

For the Defendant Vieten: Mr. Matthew Radefeld
Attorney at Law
7777 Bonhomme
Suite 1601
St. Louis, MO 63105

For the Defendant Blum: Ms. JoAnn Trog
Attorney at Law
121 West Adams
St. Louis, MO 63122



for the Derfendant Hudson: Mr. Brian Witherspoon
Assistant Public Defender
1010 Market
Room 200

St. Louis, MO 63101

For the Defendant Cox: Mr. J. Christian Goeke
Attorney at Law
7751 Carondelet Avenue
Suite 606
Clayton, Mo 63105

Transcribed by:
Lynne Shrum
Room 3.351, 111 South 10th Street
Eagleton Courthouse
St. Louis, MO 63101

3

INDEX



| | Direct | Cross | Redirect |
|---|---|---|---|
| David Rightnowar | 5 | 14 | 33 |
| Jason Grellner | 34 | 58 | |

73

86

•

4

FEBRUARY 20, 2004

THE COURT: Okay. We are here in the matter of United States versus a number of defendants.

Mr. Goeke, do you have an announcement or request on behalf of your client, Mr. Cox?

MR. GOEKE: Thank you, Your Honor.

For the reasons we had discussed previously at side bar, I am not prepared to go forward with the evidentiary hearing this afternoon and I ask that

the motions as regard to my client be continued.

THE COURT: I will continue it based upon our conversation up here, Mr. Goeke.

MR. GOEKE: Thank you.

THE COURT: You and your client are free to leave while we --

MR. GOEKE: Okay.

THE COURT: Let me do this. Do you have an interest in having your client stick here and listen to this evidence?

MR. GOEKE: I --

THE COURT: I guess he has a right to be here but he also has a right to not be here. I'll let you make that call.

MR. GOEKE: Okay.

5

THE COURT: I'll let you make that call.

MR. GOEKE: Okay.

THE COURT: Fair enough?

Okay. Mr. Delworth, are you ready to go?

MR. DELWORTH: Yes, Your Honor.

Your Honor, we call Deputy David Rightnowar.

DAVID RIGHTNOWAR, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION BY MR. DELWORTH

Q. Would you state your name, please.
A. David Rightnowar.
Q. How do you spell your last name?
A. R-i-g-h-t-n-o-w-a-r.
Q. What is your occupation?
A. I'm a detective, narcotic detective for Phelps

County Sheriff's Department.
Q. How long have you been with the Phelps County Sheriff's Department?
A. I first started in 1990.
Q. So it's approximately going on into your 14th year?
A. Yes.
Q. During the 13 to 14 years with Phelps County, have you received training with respect to identification of controlled substances such as methamphetamine and method of operation of drug



traffickers?
A. Yes, I have.
Q. I would like to direct your attention to March 14th of 2003.
Were you contacted by anyone regarding suspicious behavior on that day?
A. Yes, I was. Mr. Gray, WalMart security, had called me and said that they was people buying large amounts of ephedrine pills.
Q. And had you been working with WalMart in terms of individuals purchasing pseudoephedrine, ephedrine-type piles?
A. Yes, I have.
Q. Now did you respond up to the WalMart --
A. Yes.
Q. -- based upon that information?
A. Yes, I did.
Q. When you got to WalMart, what did you learn?

A. I talked Mr. Gray and he said they had -- the couple had pulled large amounts off the shelf and he didn't know how many they had paid for, but they had went through the counter and/or was still in the store, was going to go through the counter. He was following them around, so I went out in front and waited until they exited the store.



Q. So these individuals were pointed out to you by Mr. Gray?
A. Yes.
Q. When you were outside, did you conduct surveillance of the individuals as they exited?
A. Yes.
Q. What did they do when they exited the store?
A. They came out, went to their vehicle and started driving off.
Q. Did you follow them?
A. Yes, I did.
Q. And anything unusual you observed when you followed them?
A. I followed them down to Straubach (phonetic). When we went to turn right on Shullman (phonetic), they didn't give a turn signal and then they went to turn right into Voss's Service Station, they still didn't give a turn signal, so I stopped them.
Q. When you -- after observing the traffic violations when you stopped them, what did you do?
A. I told the driver, I believe his name was Trent Trenker (phonetic), Johnny Trenker, that he hadn't

used his turn signal on two occasions and I looked in, I seen -- I believe it was four boxes of pills containing pseudoephedrine. I asked him why the



large amount.
Q. Did you get answers?
A. He said personal use.
Q. What happened then?
A. I asked him if he'd mind me look through his car and see if he had anything else and he said, "Go ahead."
Q. And when you asked if you could look through his car -- this was the driver of the car?
A. Yes.
Q. And he said, "Go ahead" --
A. Yes.
Q. -- did the driver appear to be of average intelligence?
A. Yes, he did.
Q. Did he appear to be intoxicated or under the influence of drugs at all?
A. Not that I could tell.
Q. And do you know what his approximate age?
A. His late 20s I'd say.
Q. Did you use any type of threats, coercion, force, in any manner to get him to consent to the search?
A. No, I didn't. He was very cooperative.
Q. After he said -- you asked for consent to search

and he said "go ahead", what happened then?
A. They was female passenger and she got out of the vehicle, she had some kind of a purse strapped over her back or bag of some kind and she was going to go inside. I asked her to hold up a minute. I said like to look through your purse, she said "Yes", set it on the hood of the car.
Q. So she set the bag or whatever down, said, "Yes"?
A. Yes.
Q. Now what about this female who later indicated that she -- did she appear to be of average intelligence?
A. Yes, she did.
Q. Approximately how old was she? Do you know?
A. Somewhere close to 29 or 30.
I could look at the report. I believe it was around 29.
Q. Did she appear to be under the influence of any type of drugs or alcohol?
A. Not that I could tell.
Q. Were there any -- were you utilizing threats or coercion or force of any manner or to obtain her consent?
A. No, she was very cooperative.

10

Q. So she set the purse down and --
A. Yes.
Q. -- did you look through it?

A. I looked inside and there was a couple of syringes in there, a lot of items, but I seen two syringes and --
Q. Take the syringes out?
A. I took them out and when I pulled them out, she said, "That's meth," you know, and I --
Q. Did -- when she said "that's meth" had you asked her any questions about that?
A. Not at that time.
Q. Okay. It was spontaneous statement when you pulled it out?
A. Yes.
Q. Now was she -- was she placed under arrest?
A. Yes.
Q. And a search conducted of the car?
A. Yes.
Q. And did you seize the four boxes of pseudoephedrine tablets that they had purchased earlier?
A. Yes.
Q. Basically what was seized?
Was it two syringes from her purse and four

11

boxes that you had first observed when you looked in the car?
A. Yes.
Q. After the female passenger was placed under arrest, what happened then?
A. They were transcribed to Phelps County jail for booking.

Q. And were they -- specifically addressing it towards the female passenger, let me just put a name on it.

The female passenger, you see that individual in the courtroom today?

A. Yes.

Q. Would you please point the individual out, describe her.

A. In the red by the side of her attorney over here.

MR. DELWORTH: The record reflect the witness has identified the defendant Brandi Blum.

A. The --

THE COURT: The record will so reflect.

Q. With respect to Miss Blum, brought back to the Phelps County Sheriff's Department, was she advised her Miranda rights?

A. Yes, I did.

12

Q. How did you advise her?

A. By memory.

Q. Would you state in the record what you advised Miss Blum of.

A. I told her she has had the right to remain silent; that anything she said could and will be used against you in a court of law; you have the right to attorney and have him present before any questioning if you wish; you can -- if you can't afford an attorney, we'll appoint one without any cost. You can exercise these rights at any time not

to make any statements or answer any questions.
Q. Did you ask her if she understood that?
A. I asked her if she understood the rights, yes, and I asked her you wish to talk to me about where you going with those pills.
Q. What'd she say?
A. She said she was taking them to somewhere in Franklin County to -- that they were going to make meth with them.
Q. Did she make -- did she make additional statement?
A. She said she -- was a meth lab that she was taking them to and she said that -- I also asked her about this syringes. I said what was in the syringes, she said meth, but she said there was a meth lab in Franklin County. I told her, I said, "Well, instead of me talking to you about what all's in the lab, I'll put you on the phone with the Franklin County detective" and that's what I did.



Q. And how was she put in contact with a Franklin County detective?
A. By phone. I called him on the phone, give her the phone.
Q. So as you interviewed her she started talking and then there in the office you dial the number to put her in touch with Franklin County?
A. Yes.
Q. Did she then speak on the phone with Franklin County?

A. Yes, she did.
Q. Now during the time that she was making the statements either initially to you first or later on the phone, did you utilize any threats in order to -- coerce or force of any type in order to elicit any statements or answers to any of these questions?
A. No.
Q. Did you make any promises to her during any of this, during the initial consent to search her purse or during the time that she's making these



statements to elicit any type of statement or consent?
A. No, I did not.
Q. Now the substance contained in the syringes, was that field tested?
A. I field tested, tested positive for methamphetamine.
Q. After she was processed and advised of her Miranda rights and made a statement and put in touch with Franklin County, does that end your involvement with respect to her?
A. Yes, it did.
MR. DELWORTH: I have no further questions. Thank you.
THE COURT: Miss Trog.
CROSS-EXAMINATION BY MISS TROG
Q. Good afternoon, sir. It's Detective Rightnowar?
A. Yes.
Q. Okay. If I bungle it, apologize beforehand.

Okay, sir?
A. Okay.
Q. You were employed by the Phelps County Sheriff's Office commencing in 1990?
A. Yes.
Q. Is that correct?



A. Yes, I was.
Q. And what did you do immediately before that employment, sir?
A. I believe I drove a truck.
Q. Okay. And have you had any specialized courses, detective, with regards to methamphetamine?
A. Yes, I went through meth lab school.
Q. When was that?
A. Two years ago.
Q. Okay.
A. I'm not sure of the exact day.
Maybe it's a little over two years.
Q. Two years ago from today or two years ago from when this incident happened in '03?
A. I'm not really sure. I went billing -- I believe I'm on my third year since the meth lab school.
Q. Okay. Have you had any specialized training with regards to the sale of pseudoephedrine pills?
A. I don't know what you mean, specialized training on that.
Q. Or courses, sir, about how these pills are purchased, what they're used for?

A. Well, I know they're used for making meth, but I'm not -- as far as -- I've been to the stores and



picked up lists where we have people to sign for them.

Q. Let me try and clarify it and I'm not going to beat this like a dead horse, but was there any outside training outside of Phelps County that you ever participated in with regards to pseudoephedrine pills?

A. Only the meth lab school.

Q. Okay. And you went to that about two years ago; is that right?

A. Yes.

Q. Now you said that Mr. Gray of the WalMart store called you on 14th of '03; is that right?

A. Yes.

Q. And Mr. Gray is a loss prevention officer for WalMart?

A. Yes.

Q. And is it common practice, detective, that he would call you direct?

A. Yes.

Q. He had your phone or your cell phone number?

A. Yes, he does.

Q. When you were contacted was it by your cell phone? If you recall.

A. It probably was.

Q. Were you in the Phelps County Sheriff's Office at that time? If you recall.
A. I believe I was home.
Q. You were home.
Were you on duty, sir?
A. Probably not. I mean I'm on duty 24 hours a day when I get a call.
Q. I understand. So it's your best recollection that you weren't physically at the Phelps County Sheriff's Department when you initially received the call.
A. I really don't recall. I don't believe I was. I believe I was home when Danny called.
Q. Danny. That's Danny Gray?
A. Yes.
Q. And are you familiar with him?
A. Yes, I am.
Q. Are you a personal friend of his?
A. Well, I hadn't known him that long, but they were having problems with people stealing Sudafed off the shelf and I agreed to work with him whenever he had somebody purchasing large amounts or stealing.
Q. I understand. When you say that you agreed to work with him, that was through the Phelps County

18

Sheriff's Office?
A. Yes.
Q. Okay. Now WalMart has a problem with these

pills, don't they, sir?
A. Yes, they do.
Q. Do they have -- well, strike.
Where is the loss prevention officer normally located at the WalMart store?
A. They have little office in the back but he's all over. He just --
Q. In his office in the back do they have video camera?
A. Yes, they do.
Q. When he contacted you, detective, did he say that he had seen them on the video?
A. He didn't say.
Q. He just said, and correct me if I'm wrong, that he saw two people who were buying large amounts of pills?
A. Yeah. Well, they took large amounts off the shelf but they ended up only paying for four of them. The rest of them they put somewhere back in the store.
Q. Okay. Fine. Well, I'm going to stop you and we're going to go back and talk about what you just

19

said.
You don't know where Mr. Gray was when he observed these people buying the large amounts of pills.
We've established that. Is that right?
A. That's correct.
Q. Now at least two packages of pills were

purchased by each person; is that correct?
A. I'm not sure. I believe that -- it could have been, but I thought that he said that Johnny had purchased both of them, or all of them.
Q. So Johnny would be Mr. Trenkler (phonetic)?
A. Yes.
Q. And Mr. Trenkler would have been the operator of the vehicle; is that correct?
A. Yes, he was.
Q. Okay. When you got to the store, were you presented with copies of any receipts for these purchases?
A. No.
Q. Did you ask for them, sir?
A. No. They -- they hadn't went through the register yet.
Q. Okay. Did Mr. Gray say that he actually physically saw Mr. Trenkler leave the store with

•

20

these four packages of pills?
A. No, he didn't say.
Q. So you have no knowledge, detective, if these pills were ever placed in a WalMart bag. Is that a fair statement?
A. I'm not sure. He followed them out -- the way it works, the officer followed them out and pointed them out to me and I followed them or watched them go to the car and followed them off, yes.
Q. So you were never actually inside the store; is that correct?

A. I believe I went inside and talked to --
Q. Mr. Gray?
A. -- Mr. Gray just for a second and he pointed them out. They were over at the other side of the store, gonna go through the register.
Q. Was the store crowded that day, sir?
A. Not too much, no.
Q. Do you recall what day of the week the 14th was of '03?
A. No, I don't.
Q. Did Mr. Gray tell you that he had seen these two people placing the extra boxes somewhere else in the store?
A. He said they evidently did. He observed them

21

take several boxes off the shelf but he never observed them paying for them.
Q. Okay. But he didn't know if they placed them somewhere else in the store; is that a fair statement?
A. Well, he thought they had.
Q. Okay. And I was just asking you to repeat what he has said. That's fine.
And if I jump around, I'm going to apologize to you, sir.
At any time did you go back and ask to see the video that WalMart had?
A. I don't recall if I did or not.
Q. So if -- if you would have, sir, would that have been part of the supplementary report that you would

have made of this incident?
A. No, I had no reason to make a supplement report.
Q. Because when you were finished with the arrest and taking this statement from Miss Blum, you considered your part of this affair closed.
Would that be a fair statement?
A. That's correct.
Q. And you never went back to WalMart to ask them for the individual videotape which they may or may not have had; is that a fair statement?



A. I may have got the videotape. I've got several of them, but I never looked at it.
Q. Did the government ever ask you to provide them with a videotape that you had?
A. No. I don't know if I even still got it or not. I don't even know that I got it is what I'm trying to tell you.
Q. Sir?
A. Some I go out and get but they don't mean nothing to me because, you know, there's no charges in the --
Q. Let me just ask one more question on the point, sir.
Do you recall United States attorney's office ever asking you to retrieve a videotape?
A. I don't recall that, no.
Q. Moving on, when you -- you might have went in the store initially, spoke to Mr. Gray and then you went back outside; is that correct, sir?

A. That's correct.
Q. And then you got into your car. This a fair statement?
A. Yeah.
Q. Was it a marked car?
A. No.

•



Q. It was unmarked car?
A. Uh-huh, yes.
Q. Were you by yourself in that vehicle, sir?
A. I believe I was.
Q. Did -- was the car equipped with a video camera inside of it?
A. No.
Q. Now I believe you testified, detective, that Mr. Trenkler made two successive turns without utilizing a signal; is that correct?
A. That's correct.
Q. And that is in fact in traffic in Phelps County, would that be a fair statement?
A. Yes.
Q. Now when you stopped them at this -- this food mart or station, there was no difficulty about the stop, was there, detective?
A. No.
Q. Mr. Trenkler stopped the car?
A. Yeah.
Q. Were there any other backup vehicles that you contacted?
A. This is our fuel stop and they was several

officers in drinking coffee and getting fuel, three or four of them. I know that was there whenever --



already on the lot.

Q. Would you have had any radio communications which would have put those other gentlemen on notice that you were stopping a vehicle?

A. I could have possibly have. I believe I did call someone, I don't recall who it was, telling that I was following a car from WalMart.

Q. And did you ask for backup, sir?

A. No.

Q. You didn't have any canine in that car, did you, sir?

A. No, I did not.

Q. Mr. Trenkler, the driver of the vehicle, as you said, he was cooperative; is that right?

A. Yes, he was.

Q. And did he present proper identification?

A. The best I recall he did.

Q. And you were looking at his identification or looking in the car and that's when you spotted some boxes of pills, is that a fair statement?

A. Yes, it was.

Q. They were on the front seat, sir?

A. Yes.

Q. Were -- were the boxes open? Could you tell?

A. I don't recall.

Q. Okay. Do you recall, sir, if they were blister packs?
A. They were blister packs inside the boxes I'm sure.
Q. Okay. Did you see any blister packs or other packs that might have been used, excuse me, elsewhere in the car discarded?
A. Not that I recall.
Q. When you asked Mr. Trenkler whose pills they were, what did he respond again, sir?
A. I don't if -- she said they was for personal use. I asked him about why so many Sudafed and he said personal use.
Q. And you believe that four boxes is a large amount of pills?
A. I do, yes.
Q. Did you ask Mr. Trenkler for any receipts from these pills or for these purchases of these pills?
A. I don't recall if I did or not.
Q. Do you recall, sir, seeing any WalMart bags in the car?
A. I don't recall.
Q. Now at some point in time prior to your actual search of the vehicle, Miss Blum exited the car.
Is that a fair statement, sir?

26

A. Yes.
Q. And did she tell you where she was going, sir?
A. Says going to the bathroom.
Q. Did you have any problem with that?

A. Not at all, except I wanted to make sure she didn't take her purse and go in there and dump whatever she had.
Q. I understand.
And so you asked her to place her purse on the car?
A. I asked her if I could search the purse. She said yes, she put it on the hood of the car.
Q. And she was cooperative?
A. Yes, she was.
Q. Mr. Trenkler was cooperative, too. Would that be a fair statement?
A. Yes, he was.
Q. Did ask permission to search her bag?
A. Yes.
Q. And she said yes?
A. Yes.
Q. And inside there were two syringes; is that correct?
A. That's correct.
Q. And then according to your testimony, sir, you

27

indicated that she just blurted out when you pulled the two syringes, "That's meth"?
A. Yes, I picked it up and looked at it and she said, "That's meth."
Q. You had not again given her Miranda rights at that time?
A. No, I hadn't.
Q. Was there a reason why?

A. I hadn't found nothing.
Q. Okay. So you didn't think that those four boxes warranted an arrest?
A. I wanted an investigation and possibly an arrest if they -- if they admit they're going to cook meth with them, other than that, they probably wouldn't have.
Q. Because isn't it the law in the state of Missouri, officer, excuse me, detective, that you could buy two boxes of these pills?
A. I believe you can, yes.
Q. So simply because someone has four boxes or someone is in a vehicle with four boxes of pills containing a mixture used to make meth is not a crime in and of itself, is it?
A. Not if that's all you know they have.
Q. That's correct.



Now you stated -- I'll jump back and I apologize for this, sir.
You stated that when you initially questioned Mr. Trenkler, I think I want to say Trenker but I think it's Trenkler, that you found him to be intelligent?
A. Well, he seemed to be.
Q. He seemed to be.
Had you ever stopped him before, sir?
A. Not that I recall.
Q. Okay. Had you ever stopped a vehicle or when Miss Blum was the driver or the occupant?

A. Not that I can ever recall.
Q. Okay. What kind of questions did you ask Mr. Trenkler to determine his level of intelligence?
A. I didn't.
Q. You didn't.
A. Just asked him about the pills, personal use, and told me that he had -- leaned over to her and said go on. That's about all that I asked him.
Q. Okay. You stated that when both subjects were arrested; is that correct, sir --
A. Yes.
Q. -- they were transported back to the Phelps County jail. Is that correct, sir?



A. Yes.
Q. Then you asked Miss Blum some questions, or -- or you asked her if she wanted to make a statement?
A. I read her her Miranda rights and then asked her, yes.
Q. Right. After you read her her Miranda rights you asked her if she wanted to make a statement?
A. I asked her if she wanted -- I believe I asked her if she wanted to talk with me about, you know, what you doing with the pills.
Q. Okay. Now was this an interview room at the Phelps County jail or Phelps County Sheriff's Office?
A. Yes, it was.
Q. Was there anyone else in the room?
A. I don't recall.

Q. When -- you were both seated at a table, I mean chairs and table?
A. I'm sure we were.
Q. Did you have any recording device, sir?
A. No.
Q. Were you taking any notes?
A. No.
Q. So the report that you prepared was based on your memory; is that correct?



A. Yes.
Q. You stated, sir, that at some point in time that you had called Franklin County Sheriff's officer?
A. Yes, we went back in interview room and she said they was taking those pills to Sullivan to have them manufactured into meth and that she would like to work with us, that she knew they was a meth lab there, so I told her rather than going through it twice, we finding all about what was in the meth lab, I would put her on the phone with Franklin County deputy.
Q. Who did you call at Franklin County?
A. Mr. Scott. His name's Scott.
Q. Do you know his first name, sir?
A. No, I don't.
Q. Is he a deputy, a --
A. He's a detective.
Q. Was that conversation recorded in any way, sir?
A. Nah, not on our end. It might have been his, I don't know.

Q. Could you hear the exchange between Miss Blum
and Detective Scott or Officer Scott?
A. I didn't listen that close. I heard bits and
pieces while I was sitting around waiting for her to
get off the phone.



Q. How long was the conversation?
A. I don't know, don't recall.
Q. If I would say more than ten minutes --
A. Probably been ten minutes maybe.
Q. I --
A. I'm not sure. I was busy writing my report and
stuff.
Q. Now when you say you were busy writing your
report, were you doing it in longhand first?
A. Yes.
Q. Making notes again?
A. Yes, that's what I do.
Q. And then did you physically type it onto the
form?
A. I have someone else type it in the computer.
Q. And have you retained those notes of this
report?
A. No.
Q. They're ordinarily just trashed?
A. Just trash. Just scribbling so I don't forget,
you know, and write it out for typing on the
computer.
Q. There a reason, detective, there is no mention
made in your report of the phone call to Franklin

County?



A. No, I -- just something I never thought to do. You know.

Q. Did Franklin County ever send any officers over to see Miss Blum there?

A. I don't know if they did or not. I never followed through with it.

When I put him on the phone with her, I believe she had worked with them before, they knew her and she had worked with them before, so I don't know if they ever came down the next day or not, but I know she talked with them that night.

Q. After the conversation, was she then confined in the Phelps County jail?

A. Yes.

Q. Did that end, or what point did you end your involvement in it, detective?

A. As soon as I had her locked up.

Q. And you had no more conversations with her?

A. No.

Q. Do you recall anyone calling to talk to you about your comments with Miss Blum?

A. None that I know of.

Q. None other than maybe when the United States attorney called you?

A. I don't recall anybody talking to me.

Q. Okay.

MS. TROG: Your Honor, we have nothing further of this witness.

THE COURT: Anything else, Mr. Delworth?

MR. DELWORTH: Just a couple questions, Your Honor.

REDIRECT EXAMINATION BY MR. DELWORTH

Q. Just clarify one matter. In terms of number of pills, just to make this quick, that you observed, my understanding there were four boxes; is that correct?

A. Yes.

Q. One box of 96 tablets, one box of 24 tablets, two more boxes of 24 tablets for a total of doing meth would be 168 pills?

A. That's correct.

MR. DELWORTH: That's all I have. Thank you.

THE COURT: Anything else?

MS. TROG: Nothing further, Your Honor.

THE COURT: You may step down. Next witness.

MR. DELWORTH: May he be excused, Your Honor? He goes back to Rolla.

THE COURT: He's not an issue on any of the other events?



MR. DELWORTH: No.

THE COURT: All right.

MR. DELWORTH: Detective Jason Grellner.

JASON GRELLNER, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION BY MR. DELWORTH

Q. Would you state your name, please.
A. Detective Corporal Jason J. Grellner, G-R-E-L-L-N-E-R.
Q. What is your occupation?
A. I'm a corporal with the Franklin County Sheriff's Department in charge of the narcotics unit.
Q. Have you received training with respect to the identification of controlled substances and methods of operation of drug traffickers?
A. Yes, sir, I've received training from the Missouri State Highway Patrol; the Missouri Department of Public Safety; the Missouri Department of National Resources; Environmental Protection Agency; the Drug Enforcement Administration and the United States Army.
Q. And how long have you been with the Franklin County Sheriff's Department?
A. Going into my 13th year.

35

Q. I would like to direct your attention to October 10th of 2002.
Did you have occasion to go to a location that is 8589 Highway 185 South to do an investigation?
A. Yes, sir, I did.
Q. Had you received some information about the possibility of a production or manufacture of methamphetamine?

A. Yes, sir. Yes, sir, we had.
Q. Specifically among that information -- let me direct your attention earlier in the day.
On October 10th of 2002 were you aware of an arrest that had occurred in Washington, Missouri?
A. Yes, sir.
Q. And what did you understand had happened?
A. Two individuals had been in the Schnucks Supermarket store in Washington, Missouri purchasing hydrochloride tablets or cold tablets and had been identified by the night manager to Washington Police Department officials who had made a car stop on the vehicle and located a large amount of cold tablets in the vehicle.
Q. Did one of the occupants of the vehicle cooperate?
A. Yes, sir, he did.

•



Q. Did the occupant indicate what the pills were for?
A. The occupant advised that the pills were purchased on behalf of a Mr. Vieten and that the pills would be taken to Mr. Vieten's residence and exchanged for money or methamphetamine.
Q. And was the residence 8589 Highway 185 South I spoke of earlier, was that the residence of Mr. Vieten?
A. Yes, sir.
Q. So later that day on October 10th, did you and other officers respond out to that location?

A. Yes, sir, we did.
Q. What happened when you arrived there?
A. Between arrival at the residence we -- the residence is on a very long private driveway that services two residences.

Along the drive we came upon a vehicle coming towards us which was occupied by Mr. Vieten and a Miss Hudson. We spoke with Mr. Vieten there on the driveway and asked him to accompany us back to his residence and advising him our reasons for being on the property and asked him who was at his residence at the time.
Q. What did he reply?

37

A. He stated that he was unsure who was in his house.
Q. Did that appear odd in terms of an answer?
A. It appeared extremely odd due to the fact that he and the passenger, Miss Hudson, stated they had both just left the residence.
Q. Did you ask if anyone was manufacturing, producing methamphetamine?
A. Yes, sir, I did.
Q. What did he reply?
A. He stated that they weren't supposed to be.
Q. Now did you ask Mr. Vieten to accompany you back up to the residence?
A. Yes, sir.
Q. Did Miss Hudson also accompany you?
A. Yes, she did.

Q. Upon arriving at the residence, what happens?
A. Detective Smith and myself went to the front door of the residence and knocked and were met by Miss Blum.
Q. And did she open the door of the residence?
A. Yes, sir, she did.
Q. When she opened the door, did you detect anything unusual?
A. Immediately detected a strong odor of



combustible solvent which is, through my training and experience, associated with the manufacture of methamphetamine.
Q. Was this a very strong odor coming in?
A. Yes, sir, it was.
Q. Now just before I get into the odor and what was done, let me just identify the individuals.
You identified in the car coming out of the residence a Mr. Vieten and Miss Hudson.
Do you see those two individuals in the courtroom?
A. Yes. Just over your left shoulder seated next to the attorney is Miss Hudson and at the far end of the table Mr. Vieten.
MR. DELWORTH: May the record reflect the witness has identified defendants Erica Hudson and Benjamin Vieten.
THE COURT: Record will so reflect.
Q. When you said opening the door, was Ms. Blum?
A. Yes, sir, Miss Blum is in the red dress seated

next to Miss Trog.

MR. DELWORTH: And the record reflect the witness has identified the defendant, Brandi Blum?

THE COURT: The record will so reflect.

Q. Now you mentioned a strong odor. Did that odor



cause you any concern based upon your training and experience?

A. Yes, sir. Combustible solvents are used throughout many portions of the manufacture of methamphetamine and these solvents have explosive and flammability limits along with toxicity limits and due to the fact that they are highly, mostly extremely flammable and explosive, we entered into these residences and clear people out due to the fact that fire and explosion can occur quite readily when they find an ignition source or toxicity levels may reach a point where there is pulmonary problems.

Q. Putting it in simple terms, it may catch on fire or blow up, or, if you inhale it, it may cause damage?

A. Yes, sir.

Q. So based upon those concerns, what did you do?

A. Due to the fact that I had been hurt in a prior lab, I'm not able to make entry. I ordered others from my department who were there on the scene to make entry and clear the residence of all occupants, which they did, and Miss Blum and I believe three to four other individuals were taken out of the residence.

Q. Was it kind of opened up and aired out?



A. Yeah, the doors were opened, the windows were open and it was meant to be aired out to lower the limit inside the residence.
Q. I probably should back you up a little bit.
You were concerned, you smelled the odor. Had you asked for permission to search?
A. Yes, we had asked Mr. Vieten for consent to search the residence due to the fact that it was his residence and he stated he didn't want to allow a consent at that time.
Q. He wouldn't consent, but when you opened the door you had the strong odor?
A. Well, when Miss Blum opened the door, yes, sir.
Q. Miss Blum, I'm sorry, opened the door.
As the officers are airing out the house and bringing people out for their safety, do you -- is there anything that they observed while they're doing that?
A. Yes. The -- there's a common parking area for -- there's several buildings on the farm.
The farmhouse that Mr. Vieten's parents live in, the small residence that Mr. Benjamin Vieten himself was living in, a trailer home with some large barns, machine sheds and smaller tool sheds and there's also in the area which we refer to in our county as



a burn pile, that is some people don't have trash

pickup and they burn their trash and other sundry items and in this burn pile Detective Briggs had located starting fluid cans which had been punched and burned.

Q. Now when you mean punched, what do you mean by that?

A. Ether is the main constituent part of starting fluid and is used in the manufacture of methamphetamine and to remove raw ether from a compressed aerosol can you must first expel all of the aerosol and then invert the can and punch holes in the can with either screwdriver or sometimes a church key and then pour the raw ether, distilled ether, out of the can and this -- the fact that there were holes poked in the can shows to us that someone was involved in distilling or removing the ether from the cans.

Q. Is the poking of these cans, is that common from your experience in terms of investigating meth labs?

A. Yeah, that's the only time I see it is when we're investigating meth labs. No one discards a normal can by poking holes in it.

Q. So it's kind of almost a signature that leads you to indicate it's a meth lab?

42

A. Yes, sir.

Q. Now after bringing everybody out and kind of airing the house out, did you ask Mr. Vieten for consent to search again?

A. Yes. I advised him about the ether cans that

had been found and some other things and he began thinking about it and thought that he would let us search the house.

However, due to the fact that we had been inside to clear the residence, there were several officers now on the scene, people were in handcuffs, I thought it more prudent to apply for a search warrant because the consent may not be completely voluntary at that time.

Q. And so did you go to obtain a search warrant?

A. Yes, sir, I did.

Q. Let me hand you what's been marked as Government Exhibit 1.

Would you please identify that exhibit.

A. This package contains the application, the search warrant, the search warrant and return and I believe the affidavit.

Q. Were you the affiant for the affidavit?

A. Yes, sir, I was.

Q. And did you swear to the contents before a

43

Circuit Court judge in Franklin County, Missouri?

A. Yes, Judge Walter Murray.

Q. Same day did the judge issue a search warrant for the location at 8589 Highway 185 South?

A. Yes, sir, he did.

Q. Upon obtaining the search warrant, what happened then?

A. The search warrant was brought back to the residence and was executed on the residence.

Q. Now the individuals who were -- and evacuated from the house, were they still there waiting for the search warrant to be obtained?
A. Yes, sir.
Q. And upon executing the search warrant, did you seize a number of items at the residence?
A. Yes. Items A through item AO.
Q. And that's -- when you mentioned items A through AO you're referring to the inventory that was filed as a part of Exhibit 1?
A. Yes, sir.
Q. That inventory was made again -- made back to the court on the search warrant; is that correct?
A. Yes, sir, it was.
Q. Without going through all of the many items listed on the inventory, was there -- I want to make



specific note of number of items -- was there a clear liquid that was located on the property?
A. Yes, sir.
Q. And was that later tested and analyzed?
A. Yes, sir, it was.
Q. Found to contain what?
A. Methamphetamine, sir.
Q. Were there various items that were seized that that would constitute the components of methamphetamine lab?
A. There were chemicals and glassware there for the manufacture of methamphetamine and a few contacts from the past manufacture of methamphetamine.

Q. Based upon the execution of the search warrant, the residence and finding these items of -- what is the -- was Ben Vieten then placed under arrest?
A. Yes, he was.
Q. Was Brandi Blum placed under arrest?
A. Yes, sir, she was.
Q. First of all, with respect to -- let me take Brandi Blum first.
Was Miss Blum advised of her Miranda rights?
A. Yes, sir, later at the sheriff's department.
Q. And who was she advised of her Miranda rights by?



A. She was advised by me.
Q. How did do you do that?
A. From a card which I keep in my badge carrier.
Q. Do you have the same card on you today?
A. Yes, sir, I do.
Q. Would you read in the record what you advised Miss Blum of.
A. You have the right to remain silent. Anything you say can be and will be used against you in a court of law. You have the right to talk to a lawyer and have him present with you while you are being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish. You can decide at any time to exercise these rights and not answer any questions or make any statements, and then I then accompany it with the waiver and ask do you

understand each of these rights as I explained them and having these rights in mind do you wish to talk to me now.
Q. And did Miss Blum indicate she understood those rights?
A. Yes, sir, she did.
Q. And did she agree to answer questions and make a statement?

•



A. Yes, sir, she did.
Q. And let me hand you what's been marked Government Exhibit 3.
Would you please identify Government Exhibit 3.
A. Government Exhibit 3 is pages nine and ten of Franklin County report 10559 which covered the interview of Brandi Blum done by me.
Q. And is this the report regarding the statements that and answers to questions that she made to you back on October 10th, 2002; is that correct?
A. Yes, sir.
Q. Now did you also interview Benjamin Vieten?
A. Yes, sir, I did.
Q. And did you advise him of the same Miranda rights off of that card?
A. Yes, sir, I did.
Q. Did he indicate that he understood his rights?
A. Yes, sir, he did.
Q. And did he initially agree to make a statement?
A. Yes, sir, he did.
Q. And what -- what did he initially say?

A. Mr. Vieten attempted to explain away each of the items that had been located on the property, not giving credence or acknowledgment to the fact that these items were used in the manufacture of



methamphetamine, especially in the state that they had been found in, and I advised Mr. Vieten that if he was going to continue to lie and make false statements that would be in his best interest to not answer statements as they would be used to impeach him at a later time.

At that point Mr. Vieten advised that he would like to speak with an attorney.

Q. Did all the questioning cease at that point?

A. Yes, sir, it did.

Q. Was there any attempt to interview Erica Hudson?

A. Yes, sir.

Q. And Miss Hudson make a statement?

A. No, she did not.

Q. Now with respect to the initial statements of Ben Vieten, statements of Brandi Blum, was there any threats made, coercion used, force used in order to elicit any statements and the answers to any questions?

A. No, sir, there were not.

Q. Would that be the same for Mr. Vieten?

A. Yes, sir, it would be the same.

Q. And with respect to both Mr. Vieten and Miss Blum, any promises made to Ms. Blum or Mr. Vieten to elicit any statements or answers to any questions?

A. No, they were told it would be in their best
interest to answer truthfully.
Q. Now I would like to move ahead to March 14th of
2003.
On that date was a search warrant obtained for
residence of 8589 Highway 185 South?
A. Yes, sir, it was.
Q. This is the same residence of Mr. Vieten that
we -- that had been searched on October 10th; is
that right?
A. Yes, sir, it was.
Q. Let me hand you what's been marked as Government
Exhibit 2 and -- Government Exhibit 2, please
identify that.
A. Government Exhibit 2 is a certified copy of the
application, search warrant affidavit and search
warrant with return that was applied for and granted
on the 14th.
Q. And the affiant on that was Detective Briggs; is
that correct?
A. Yes, sir.
Q. And you spoke with Detective Briggs; is that
correct?
A. Yes, sir, I did.
Q. Did he swear out before a circuit court judge in



Franklin County, Missouri?

A. Yes, sir, he did.
Q. Based upon the application affidavit, was a search warrant then issued for that location at 8589 Highway 185 South?
A. Yes, sir, it was.
Q. Now based upon the obtaining of a search warrant -- and let me add one other thing.
The Government Exhibit 2 contains the application, search warrant. There's also an affidavit; is that correct?
A. Yes, sir.
Q. With respect to the affidavit, let me direct you to paragraph three.
Does that set forth the information that was obtained by doctor -- excuse me, by Detective Scott Briggs from the phone conversation from Brandi Blum who had been arrested that same day, March 14th of 2003?
A. Yes, sir, it does.
Q. Now prior to obtaining the search warrant, was it then executed that same day, March 14th of 2003?
A. Yes, sir, it was.
Q. And what happened at the residence?
A. This time we came with a search warrant and upon

50

arrival, knocked at the door. There was no answer at the door, officers surrounded the house, and an entry team which had been prediscussed then breached the door and made entry into the residence, at which time they made contact with Mr. Vieten and Miss

Hudson.

Q. And now when there was a knock and announce, was there a period of time that elapsed between the knock and announce and the forced entry?

A. Yes, sir, there was.

Q. Do you know how much time had elapsed?

A. Anywhere from five to ten seconds I'm sure.

Q. Now when entry was made, do you recall where Mr. Vieten was, what he was doing?

A. Mr. Vieten -- I was not on the entry team. However, from speaking with officers on the scene, Miss Hudson was located near the front door of the residence and Mr. Vieten was located in the bedroom of the residence.

Q. Now you indicated Miss Hudson.

Erica Hudson was present?

A. Yes, sir.

Q. And also Ben Vieten?

A. Yes, sir.

Q. On making entry, was a search conducted in that

51

other residence?

A. Yes, sir, it was.

Q. And in Government Exhibit 2 is there a return that was made of the items that were seized?

A. Yes, sir, there is.

Q. And now Government Exhibit 1, the search warrant on October 10th, that package, Government Exhibit 2, the search warrant package for 14th was certified copies; is that correct?

A. Yes, sir.

Q. And in -- with respect to going through the certified copies for the 14th package, was observed that one page of the inventory had inadvertently not been copied?

A. Yes. Page four of the crime scene search warrant inventory which had been attached and returned to court had not been copied and made a part of this record.

Q. I would like to refer you to Government Exhibit 2-A.

If you could identify that.

A. Exhibit 2-A is a copy of page four which was supplied to the courts on the return.

Q. So that just basically is part of the certified copy. Page four was left out, but that be the copy

52

of the same page four that should have been contained in there?

A. Correct, sir.

Q. So in other words, page four was returned to the court, it's just when the certified copy package was made it had been inadvertently left out?

A. Correct, sir.

Q. Now in terms -- without going through all the items that were seized in the return -- there was notes, glass containing some liquid, or was that later analyzed?

A. Yes, sir, it was.

Q. Found to contain what?

A. Methamphetamine.
Q. Those are also various pseudoephedrine or ephedrine pills that were seized from that location?
A. Yes, there were on that date.
Q. Were there also items seized that would be utilized in the manufacturing of methamphetamine?
A. Yes. Once again there were chemicals and apparatus used in manufacturing as well as artifacts from past manufacturing.
Q. Following the seizure of these items pursuant to the search warrant, was Mr. Vieten and Miss Hudson arrested and taken into custody?



A. Yes, sir, they were.
Q. Now specifically Erica Hudson, was she advised of her Miranda rights?
A. Yes, sir, she was.
Q. And where was that?
A. She was advised of her Miranda rights while she was in the rear seat of a patrol vehicle on the property.
Q. Who advised her of her rights?
A. I did.
Q. Was it off the same card?
A. Yes, sir, it was.
Q. Same rights that you read in the record earlier?
A. Yes, sir.
Q. Did she indicate that she understood her rights?
A. Yes.
Q. And did she agree to make a statement and answer

your questions?
A. Yes, but she didn't want to do it where Mr. Vieten could hear her because she was scared of Mr. Vieten.
Q. Where did she make the statement at?
A. Statement was later taken from Miss Hudson back at sheriff's department.
Q. And went from that location back to the



sheriff's department?
A. Yes, after the search.
Q. And at that time did she make a oral statement to you?
A. Yes, sir, she did.
Q. Let me hand you what's been marked as Government Exhibit 4.
Would you please identify that exhibit.
A. Pages six, seven and eight, Franklin County Sheriff's Department, complaint number 2003-214 covering the oral interview of Erica J. Hudson.
Q. And was there a report regarding the oral portion of the statement that she, Miss Hudson, made to you on March 14th of 2003?
A. Yes, it covers both the immediate responses she made while on scene as well as an in-depth interview held at the sheriff's department.
Q. Did Miss -- did you ask Miss Hudson if she would reduce her statement to writing?
A. Yes, sir, I did.
Q. What did she say?

A. She stated that she would and I provided her with a paper and she provided me with a written statement.

Q. Let me hand you what's been marked as Government



Exhibit 5.

Would you please identify that.

A. This is a photocopy of the written statement provided by Erica Hudson.

Q. And was that statement written out by her?

A. Yes, sir, it was.

Q. Or, precisely, printed out by her in her printing?

A. Yes, sir.

Q. The second page of it bears a signature, Erica Hudson. That her signature?

A. Yes, sir, it is.

Q. Observed her sign that statement?

A. Yes, and apply the Social Security number.

Q. The terms of both the oral statement, Government Exhibit 4 and the written statement, Government Exhibit 5, did you -- were there any promises made to Miss Hudson to solicit answers to your questions or for her to make a statement?

A. No, sir, there were not.

Q. Was there any threats or coercion, force utilized at all to elicit the statement and the answers to the questions?

A. No, sir.

Q. What about Mr. Vieten?

Was he advised of his Miranda rights?
A. Yes, sir, he was.
Q. Did he make a statement?
A. He advised he was represented by counsel and wished not to make any statements.
Q. Did all the questioning cease at that point?
A. Yes, sir, it did.
Q. Now I want to finally move on to one other matter.
I apologize, Your Honor. One other matter brought to my attention and advised of by Mr. Witherspoon at the hearing and that's at the time of Miss Hudson's arrest.
Now was there a grand jury indictment that was handed down charging a number of people, including Miss Hudson?
A. Yes, sir.
Q. Was there an arrest warrant -- there was an issue pursuant to that grand jury indictment?
A. Yes, sir, there was.
Q. And pursuant to that indictment and the arrest warrant, did you participate in the arrest of Erica Hudson?
A. Yes, sir, I did.
Q. And where did that take place at?



A. The Stanton Delta Motel, Room Number 4.
Q. Was she there with anyone?

A. She was there with Mr. Vieten.
Q. And was she taken into custody at that point?
A. Yes, sir, she was.
Q. Did she have a purse or handbag at that time?
A. She did. However, Miss Vieten (sic) was found in possession of a needle or syringe containing methamphetamine at the time of the March search warrant in 2003.
Q. I'm sorry. I -- I'm mixing it up.
Was the time of arrest, was it back at this March incident?
A. During the March incident. However, during the arrest at Room Number 4 there were syringes containing methamphetamine field tested for methamphetamine as well as powder field tested for methamphetamine found in the room occupied by Miss Vieten -- Mr. Vieten and Miss Hudson.
Q. So these were in the room that the arrest took place; is that correct?
A. Yes, sir.
Q. Let me back you up then. I apologize.
On the March incident she was taken into custody and made a statement; is that correct?

58

A. Yes, sir.
Q. Was there a search conducted incident to arrest?
A. There was a search of her purse, yes, sir.
Q. And what was located in her purse?
A. Located inside the purse was a hypodermic syringe containing a liquid which tested positive

for methamphetamine and when sent to the laboratory showed positive for methamphetamine.

MR. DELWORTH: Thank you. I have no further questions.

THE COURT: All right.

Mr. Radefeld?

MR. RADEFELD: Thank you, Your Honor.

CROSS-EXAMINATION BY MR. RADEFELD

Q. Now detective, you stated that your reason for going to -- what we'll call the Vieten farm was for what?

That you had confidential information or an anonymous tipster?

A. You're going to have to specify which one.

MR. RADEFELD: I'm sorry, Your Honor.

Q. October 10th, 2002.

A. We had received complaints from anonymous sources and local citizens over the past weeks or months prior and then upon receiving the information

59

from the Washington Police Department, decided to investigate.

Q. So when you say the Washington Police Department, you're talking about Matthew Cox; correct?

A. Yes, sir.

Q. So this information that you had received from concerned citizens, what kind of information was that?

A. Heavy traffic in and out of the farm with people

staying for short durations and that these occurrences were taking place at all hours of the day and night; that Mr. Vieten, Benjamin Vieten, was not working; that clandestine lab trash had been located along the road ditches of Highway 185; that vehicles were -- and then traffic violations, no license plates and just regular traffic violations were ongoing from vehicles coming in and out of the farm.
Q. So you don't -- do you know of actual tickets being written to people with no license plates on that drive? Or I'm concerned about what you were talking about with that.
A. Citizens were calling these complaints, stating that they needed to do something about it.

60

Q. Okay. Now how big is the Vieten farm?
A. I don't know the square acreage. I know that from the point of the road, along Highway 185 up to the house is approximately six-tenths of a mile but I also know that drive services not only the Vieten's residence but another residence along that road, so I am not sure how much of the property's owned by the Vietens.
Q. So are there a lot -- are there a lot of neighbors around there or just simply (inaudible) residence that's listed on there?
A. On the six-tenth of a mile road is only one other residence that I know of. However, there are homes up and down Highway 185.

Q. And that's a public highway; correct?
A. Yes, sir, it is.
Q. And the trash that was found on the side of the road, it was -- did you ever find that it belonged to Mr. Vieten?
A. No, sir.
Q. And so Matthew Cox had given you some information about Mr. Vieten, but -- and you're aware that Mr. Cox had made a written statement; correct?
A. Yes, sir.



Q. And did you actually or did anyone in your department orally talk to Mr. Cox?
A. Yes. Detective Briggs spoke with Mr. Cox.
Q. And at any time did Mr. Cox ever say where exactly Mr. Vieten lived presently?
A. Yes, he gave us the directions and the description of the residence and how to get there and where -- and where to turn at the red house and described where the red house would be located on Highway 185 South.
Q. He just didn't say it was Mr. Vieten, he actually gave directions to the house?
A. Yes, sir, he did.
Q. Now with that information from Mr. Cox and these concerned citizens, did you ever go get a search warrant?
A. No, sir.
Q. Why did you not get a search warrant at that

time?
A. Mr. Cox had not been proven to be reliable and from the complaints from the citizens being strewn out over that amount of time and the unreliability as not been proven from Mr. Cox, I did not believe that we had risen to the height of probable cause but that we were in an area of reasonable suspicion



that needed to be investigated.
Q. And the statements from the concerned citizens, did you ever set up any sort of observation post to observe this heavy amount of traffic going to and from the Vieten residence?
A. No, sir. I asked that they jot down license plate numbers if they could get them.
Q. And did they do that for you?
A. Yes, sir, they did.
Q. And what was the stretch of time in which they gave you these license plate numbers?
A. Again I believe it was a matter of few weeks to possibly as long as a month or two prior.
Q. How many cars did they say went through there?
A. They just said numerous, sir.
Q. Over 50?
A. Sir, they just said numerous.
Q. So other than from what you had learned from these concerned citizens, you or your department did not do anything to confirm that there was a heavy amount of traffic going to and from the Vieten residence; correct?

A. I asked patrol officers to at -- as best they could patrol that area and attempt to make traffic stops on traffic violations.



Q. And did they do that?
A. Yes, I believe they did.
Q. And anything that would amount to -- to -- to be geared at Mr. Vieten at all?
A. I don't recall whether the -- there was at least one if not two traffic stops which occurred and I do not remember if it was before the October search warrant or the search warrants were made on individuals who were known drug traffickers from intelligence and arrest reports.
Q. Now this -- you said that this one residence shared the road with the Vietens, but did you ever do any independent investigation to figure out who owns that private property, that private road?
A. No, sir.
Q. And you don't know if those people who also shared that driveway, if they had any sort of easement or permission to use that, this road, do you?
A. I would expect that they did since their house was on it.
Q. But you don't know. Did they ever tell that you they owned it or that the Vietens owned it?
A. I've been to that residence in the past when a prior owner had that residence for a narcotics

report but no, sir, I have no idea who actually owns the road or the driveway.
Q. But that is actually a private driveway; correct?
A. Yes.
Q. And you at that time that, or at least you thought that Mr. Vieten resided at that location?
A. The information from Mr. Cox and from the citizens were that he was a residing in a -- in a residence on the property, yes, sir.
Q. Now when you actually -- on October 10th of 2002 you went on to that private driveway and did you -- you set up some sort of roadblock; correct?
A. We were driving up the road.
Q. So you encountered Mr. Vieten, what you found later on to be Mr. Vieten in the car; correct?
A. I believe it was a truck, but yes, sir.
Q. Okay. You stopped that truck?
A. Well, we couldn't pass it. It's a one-lane driveway.
Q. So no one was -- no one from your department was stopped and standing on top of their car with binoculars?
A. No, we were driving up the driveway, doing and speaking with Mr. Vieten, and we -- he came one way



and we came the other.
There was a line of police cars and his truck.

Q. How many police cars did you say there were?
A. Usually in these situations we take at least one but we may have taken two marked units and there would have been at least two if not possibly three pickup trucks.
Q. So when you encountered Mr. Vieten on this road you then approached Mr. Vieten's car; correct?
A. Yes, sir, I did.
Q. And did you take Mr. Vieten -- you took Mr. Vieten out of his vehicle; correct?
A. I asked him to step out of his vehicle and speak with me, yes, sir.
Q. And this was located on the private drive; right?
A. Yes, sir.
Q. Now was it closer to the -- was it closer to the residence or was it closer to the highway?
A. Probably closer to the highway.
Q. When you got Mr. Vieten out of the car you then proceeded to ask him questions; correct?
A. Correct.
Q. And at that time you believed that there was a possible meth lab on that property; right?

66

A. Yes, sir.
Q. And when you stopped Mr. Vieten and took him out of the car, was he free to leave the area at that time?
A. If he had persisted to say that he was to leave and wasn't going to go with us up to the house, yes,

he would have been allowed to leave the area.
We had no reason to arrest him at the time.
Q. However, due to your car's blocking him, he could not have gotten in his car and proceeded to drive on to the highway; correct?
A. He had pulled, or towards into the road that he couldn't have drove around us, but he could have left after we went past him.
Q. But then you began to ask Mr. Vieten questions that could potentially be incriminating; correct?
A. I asked him questions that were in regard to who was in his residence and the information that we had been receiving about whether or not he was involved in the manufacture of methamphetamine or anyone on the property was, the same questions we ask anyone in these types of investigations.
Q. And the answer to those questions could potentially be incriminating, though; correct?
A. Yes, sir.



Q. And after you asked Mr. Vieten if you could search his property, he told you no; right?
A. That was up -- at the residence, yes, sir.
Q. Well, when you were down and you encountered Mr. Vieten at his car and you took him out of the car, you put Mr. Vieten in handcuffs; correct?
A. No, I don't recall putting him in handcuffs.
Q. So no one put Mr. -- Mr. Vieten bent over the hood of a car and put handcuffs on him?
A. I do not recall Mr. Vieten being put in

handcuffs at that time, no, sir.
Q. Well, Mr. Vieten was placed inside of a police car; correct?
A. Yes, sir.
Q. And Mr. Vieten was not allowed to take his own truck back up to his house, was he?
A. That is correct.
Q. And he was put in the back of those police car; correct?
A. I don't know if he was in the front seat or backseat. I was driving a truck.
Q. And at that time when Mr. Vieten was in the car he was not free to leave the area, was he?
A. No, sir, he was not.
Q. So at that time Mr. Vieten was in custody of

68

your department; correct?
A. He was asked to accompany us back up to the residence which he stated he would do and he was given a ride.
Still if we'd have got to the residence and he said he was going back down to leave, I'm sure he could have left.
Q. At no time -- strike that.
Just to clarify. When you had Mr. Vieten in the back of your car, no one attempted to get a search warrant at that time?
MR. DELWORTH: Your Honor, I'm going to object. The question assumes facts not in evidence. The witness testified he didn't know if he was in

the front seat or the backseat, the question was when you put him in the backseat. That's not evidence.

THE COURT: Sustained.

MR. RADEFELD: Fine.

Q. When Mr. Vieten was in your custody at that time, did anybody go get a warrant?

A. No, sir.

THE COURT: Well, actually the testimony was he wasn't in custody. The testimony is he was free to leave, he was in the car.



MR. RADEFELD: Actually, Your Honor, I think he said when he was in the car he was not free to leave.

THE COURT: No, he said he was. When he got up to the house, if you want to leave -- let me ask.

I'll stop this because I don't have the patience for this right at this moment.

Any time -- and I'm -- any time was Mr. Vieten free to leave up until the time he was arrested?

THE WITNESS: Up until the time the door opened, Your Honor, he was free to leave.

THE COURT: He was free to leave at any time.

THE WITNESS: Yes, sir.

THE COURT: Now go on.

MR. RADEFELD: Thank you, Your Honor.

Q. But prior to going up to the house, Mr. Vieten

did say that or -- I'm sorry, your testimony today is that Mr. Vieten said that you need a search warrant after you drove up to his house; correct?
A. Right. He said he didn't know who was there. I said well, let's go up and see. We went up to the house, I asked if I could go inside and see who was inside and he said he didn't want us going inside.

•

70

Q. And when you drove up to the house you claim that you actually -- did you see items in plain view?
A. Detective Briggs drew my attention to the -- the burnt ether canisters which had been punched and then the other items listed as plain view were viewed after making entrance into the residence to clear the residence of its occupants.
Q. Nothing else, just the burn pile that day you could see in plain view?
A. Again, as I just answered, the burn pile was in plain view in the common area.
Q. Yes.
A. Once the door opened and officers made entry and were legally inside the residence where they could be, in plain view inside that residence were other items.
Q. Drove up, though, the only thing you could see was the burn pile; right?
A. Correct.
Q. Now and you also were testifying that Mr. Vieten stated that you need a search warrant after the

front door had already opened; right?
A. No. Before the front door was opened, I asked Mr. Vieten if I could go inside to see what was



there because Mr. Vieten had told me he had no idea who was inside his house or what was going on inside his house.
Q. But you believed Mr. Vieten to be living there at that time, though?
A. Yes, sir.
Q. And you believe that he had the authority to give consent, let you into the house; right?
A. Yes, sir.
Q. And at that time Mr. Vieten told you that he did not want you to go inside the house; right?
A. Correct.
Q. And it was after you entered the house that the house was cleared and that's when you obtained your search warrant; correct?
A. Yes, sir.
Q. And then that's what's listed as Government Exhibit 1 that you currently have in front of you?
A. Yes, sir.
Q. And you did not put anywhere on that search warrant that you already entered the residence, had you?
A. Paragraph four states because of the danger from the chemical, chemicals, officers entered the residence to remove anyone inside the residence,

making sweep through the residence. We saw in plain view the following: Three one gallon cans of Coleman fuel; a gas cylinder with blue discoloration to the valve.
Q. This is October 10th search warrant?
A. Yes, sir.
Affidavit, paragraph four. Okay.
Q. Now on the search warrant on the March 12th or the 14th date --
A. Yes, sir.
Q. -- when you stated in paragraph two on the application for the search warrant --
A. Sir, that was stated by Detective Briggs, but you can go on.
Q. I apologize. Just for the record, is Judge Eppelcamp (phonetic) in Franklin County, is she an associate circuit judge?
A. Yes, sir, she is.
Q. And do you have in your possession or in your files anywhere a lab report done for the March -- the 14th seizure?
A. I believe it's in the file, sir.
Q. But you say this is a lab report that's different from the seizure that was done October of 2002?



A. Yes, sir.
Q. So there are two different lab reports?
A. Yes, sir.

MR. RADEFELD: I have nothing further, Your Honor.

THE COURT: Thank you.

Miss Trog?

CROSS-EXAMINATION BY MISS TROG

Q. Good afternoon, Agent Grellner.
A. Good afternoon, ma'am.
Q. I'll try not to be repetitious.
A. Yes, ma'am.
Q. Okay?
Going to the search of the house on October the 10th --
A. Yes, ma'am.
Q. -- we've been through the preliminaries, so we'll skip that.
Who knocked on the door, sir?
A. Detective David Smith.

MR. DELWORTH: We would object. I don't think Miss Blum has any standing with respect to the search of the residence, certainly Mr. Vieten.

MS. TROG: Your Honor, the Court would bear with me, I just have a couple of questions as -- as

74

to Miss Blum's placement in the hall initially.

THE COURT: Does your client -- number one, I'll let you -- you can certainly ask those questions, but first I would like an answer from you which is does your client claim any possessory interest in the residence or anything in the residence?

MS. TROG: No, Your Honor, we don't.

THE COURT: So she does not have standing.

MS. TROG: We agree with that, Your Honor.

THE COURT: But not withstanding, I just want to know where we stand and I'll let you ask. All right?

MS. TROG: Sure.

Q. My question is, Agent Grellner, is you said there was a knock on the door; is that right?

A. Yes, ma'am.

Q. Now was this a solid door, sir?

A. Yes.

Q. Did it have any glass in it?

A. I don't recall there being any glass in it.

Q. Excuse me.

MS. TROG: Your Honor, may I approach the witness, please?

THE COURT: You may.

75

Q. Sir, I've handed you what's been marked Defendant's Exhibit I. That would be Defendant Vieten's Exhibit I, although it was never entered into evidence.

Does that portray the house that you entered, sir?

A. Yes, sir.

Ma'am, I'm sorry.

Q. That's okay. Does it show a solid door there, sir?

A. It shows a wooden door with a spot for window

but it's been covered over with a board.
Q. Now on October the 10th was that covered over with a board?
A. Ma'am, to tell you the truth, I can't recall. I know we could not see inside the residence. However, there was a camera, video camera set up on the front porch overhang so they could see out to us.
Q. I understand, but you don't recall -- and I don't want the words in your mouth if --
A. We could not see inside, no, ma'am.
Q. Okay. Who knocked on the door, sir?
A. Detective David Smith.
Q. Detective Smith.



And he's a member of the Franklin County --
A. Sheriff's Department. He was at that time a part of the narcotics squad.
Q. Okay. Could you view, sir, in your personal observation who opened the door?
A. Yes. Miss Blum.
Q. Was Mr. Daniel Messee (phonetic) in the immediate area?
A. Yes.
Q. Could Mr. Messee have opened the door and you saw Miss Blum?
A. That could have happened, yes.
Q. Okay. After the door was opened, it's my understanding that because of this obnoxious smell everybody was removed from the premises; is that

correct, sir?
A. Yes. When we arrived on the scene we could smell chemical odor but commonly when people involved in manufacturing dump out their chemicals, sometimes the smell arises just from the ground, from being dumped out, but when the door opened there was an overpowering odor.
Q. Sure. I understand.
Now when -- who was the gentleman who you said went through first, sir? I'm sorry.

77

A. Detective David Smith.
Q. When Detective Smith went through, did you follow him?
A. No, ma'am, I cannot enter into the labs any more.
Q. Okay. Do you recall how Miss Blum was dressed?
A. Blue jeans and some sort of a top.
Q. Did she appear sleepy to you, sir?
A. I do not recall.
Q. Now eventually everybody was gathered together, all the occupants of the house, and they were removed to the Franklin County Sheriff's Department; is that correct, sir?
A. Yes. Once the search warrant was issued and began to be executed and items were located pursuant to that search warrant, all of the occupants, including Mr. Vieten and Miss Hudson, were transported to the sheriff's department.
Q. Okay. Now there was a seizing officer and that

was Detective Smith?
A. Yes, ma'am.
Q. And the photo officer as listed on your Government Exhibit Number 1 was Detective Scott Briggs?
A. I believe so, yes, ma'am.

•



Q. Now I'm going to jump around here, Agent Grellner, and I don't mean to do this, okay?
A. That's okay.
Q. This is the only way I can figure out how to say this.
Is Detective Scott Briggs, if you know, sir, the same individual who talked with Brandi Blum with regards to the 14th '03 incident?
A. Yes, ma'am. His first name is Scott, not his last name.
Q. Okay. Now going back to that 14th --
A. Yes, ma'am.
Q. -- talk with Miss Blum, were there any reports made of that, Agent Grellner?
A. There was just the information that was provided in the affidavit from Miss Blum.
Q. Okay.
A. So if you consider the affidavit a report, then yes, ma'am, there was.
THE COURT: Talking about the affidavit, the search warrant.
THE WITNESS: Yes, sir.
Q. So there was no independent reports made?

A. Not if it is not attached to this report at the current time.



Q. And are you aware of any reported equipment that was in place at the time, sir?
A. Our department as a part of business records many of the phone lines into the office.
Ma'am, I am not aware at this time and have not listened to or attempted to be taken a recording of the phone conversation and I'm not sure at this time if one would even at this point remain.
Q. I understand. Now we're going to go back to --
A. Yes, ma'am.
Q. -- October.
There were certain items retrieved according to Government Exhibit Number 1. Is that correct, sir?
A. Yes, ma'am.
Q. And among them is listed on Item Number I, Agent Grellner --
A. Yes, ma'am.
Q. -- there -- get myself here.
It talks about the location.
A. Yes, ma'am.
Q. It says is it -- is it S bedroom?
A. Which would stand for south.
Q. Is there a north bedroom?
A. Well, it's a very small, probably not more than six or 800 square foot residence and some of the

rooms were probably at one time meant to be now one thing and were now being used as another, so I think we had decided that two rooms were being used as bedrooms and so we decided to call one south and one north.
Q. Would it appear nothing was ever removed from the north bedroom, would that be a fair statement?
A. Yes, ma'am.
Q. And on Item I there were some -- some videotapes retrieved. Is that a fair statement, sir?
It would be on the first?
A. Yeah, I'm reading now.
Yes, ma'am, videotapes.
Q. Have you viewed those videotapes as you know?
A. I'm sure I have, ma'am, but I do not recall what was on those tapes. I do not believe those tapes contain any video information regarding your client.
Q. That's what I was getting at. Thank you, Agent Grellner.
With regards to Item Number P on the following page, there was listed the driver's license of Brandi Blum.
A. Yes, ma'am.
Q. And according to report, that was found, I believe, inside her coat which was lying on a plate?

81

A. Yes, ma'am.
Q. Now other than Brandi Blum's driver's license, were any other items retrieved from that house that

had to do with her?
A. Retrieved, no, ma'am.
Q. Okay. So when in your report you say there was personal property and clothing, nothing was ever retained by your officers; is that a fair statement, sir?
A. That is a fair statement, yes, ma'am.
Q. With regards to the surveillance camera on the outside of the home --
A. Yes, ma'am.
Q. -- that you referred to, did you review the tapes inside of those, sir?
A. That may be where the videotapes came from, ma'am, I'm not sure. The camera was hooked to the television and VCR in the living room.
Q. Was -- was the television on?
A. Yes, ma'am.
Q. So when you viewed the t.v., did it show the surveillance or did it show just --
A. It showed the surveillance.
Q. It showed -- okay.
And I don't mean to be repetitious here, but you

82

don't recall any videotapes that had Brandi Blum in it?
A. No, ma'am, I do not.
Q. Okay.
A. The only thing --
Q. Nope, that's fine. Thank you.
Now with regards to your interview of Miss Blum,

and that would go back, sir, to Government Exhibit Number 3 --
A. Yes, ma'am.
Q. -- that was taken at Franklin County Sheriff's Department?
A. Yes, ma'am, it was.
Q. It was in an interview room?
A. Yes, ma'am, it was.
Q. Who was in the interview room, sir?
A. Just myself and Miss Blum.
Q. Was there any recording devices?
A. No, ma'am, there were not. Video or audio.
Q. Okay. Did you take notes on that conversation, sir?
A. Yes, ma'am.
Q. Do you still have those notes?
A. No, ma'am, I do not.
Q. Okay. You conducted a good many interviews; is

•



that correct?
A. Yes, ma'am, I do.
Q. In fact, Miss Blum's was the first of three or four; is that a fair statement?
A. First of four I believe.
Q. That's what I thought. First of four.
And so you drafted up this report as a result of those notes; is that a fair statement?
A. Yes, ma'am.
Q. Now you stated that before the interview began that you read Miss Blum her Miranda rights?

A. Yes, ma'am.
Q. And you recited those rights from your card; is that right?
A. Yes, ma'am.
Q. To your knowledge, was she ever given any or given her Miranda rights there at the Vieten farm by you or anyone? If you know.
A. I do not recall, and there were several officers on the scene.
Q. Okay. How long did your interview of Miss Blum take, sir?
A. I think it was the long -- I think hers was about the second longest and it probably took anywhere from 20 to 40 minutes.



Q. 20 to 40 minutes?
A. Yes, ma'am.
Q. Was she able to use the restroom facilities if she needed?
A. She was in custody at that time and if she have needed to, she would have been escorted by a female deputy or taken back to the jail staff to use the facilities.
Q. Was she cuffed at that time, sir?
A. Yes, ma'am. That's a part of our departmental procedure, that whenever an arrestee is removed from the jail portion of the building to the detective bureau portion of the building that they are placed in leg shackles and handcuffs.
Q. Were the cuffs in front of her?

A. In front.
Q. Did she ever make any complaints, sir?
A. No, ma'am.
Q. She ever request an attorney, sir?
A. No, ma'am, she did not.
Q. Was the decision -- strike that.
Did you, sir, ever ask her if she wanted to make a written statement?
A. No, I don't believe I did.
Q. And the interview was concluded at a point in



time that you didn't think she was telling the truth. Is that a fair statement?
A. Yes, ma'am.
MS. TROG: Just one moment, Your Honor.
I think I'm finished, Your Honor.
THE COURT: Okay.
Q. A couple more questions. Sorry.
When did you actually prepare this report, sir, the report --
A. It would have been prepared within the next day or two, then it goes to our clerk typist and she types them in.
Q. Was report ever reviewed and revised?
A. If it was, it was -- it would have been reviewed by my sergeant, I would have reviewed it for content and then he reviews for typos and spelling and that sort of thing.
But as far as revisions or supplements made, I don't believe there were any.

Q. So after this report was done on October the 10th of 2002 that you prepared and was submitted there were no supplemental reports made?
A. Oh, no, ma'am.
Q. Okay.
MS. TROG: Your Honor, we have nothing further of this witness.



THE COURT: Okay.
Mr. Witherspoon?
Before you start, I have a question. I'm confused and maybe you all understand it and I don't, but according to the Exhibit 1, I thought your testimony was that in the return on Exhibit 1 items A through AO, I'm not sure how many items that encompasses, those items were seized prior to the search warrant, they were being executed.
THE WITNESS: They were seized with the search warrant, Your Honor.
THE COURT: With the search warrant. Not prior.
Nothing was taken out of the house prior to the search warrant.
THE WITNESS: No, sir, there was not.
THE COURT: Okay.
CROSS-EXAMINATION BY MR. WITHERSPOON
Q. Detective Grellner --
A. Yes, sir.
Q. -- prior to your encounter on the private drive at the -- what's been referred to as the Vieten

farm, had you ever had any contact with Erica
Hudson?



A. I do not believe so, sir.
Q. In either of the search warrants that the government has, number one or number two, did either in your affidavit or Detective Briggs' affidavit had you gotten any information from the informant about an Erica Hudson?
A. The second search warrant in March we used information from the first warrant in the application and affidavit. However, I do not believe that Miss Hudson was directly referenced.
Q. Had the -- wait a second.
When the police vehicles encountered the vehicle with Miss Hudson and Mr. Vieten on that private drive, do you recall, sir, whether Mr. Vieten was driving or Miss Hudson.
A. I believe Mr. Vieten was driving.
Q. Okay. Now under whatever circumstances you all got Mr. Vieten back to the residence from that spot on the drive, do you recall where Miss Hudson was?
A. She was brought back up to the residence also.
I don't believe she was in the same car as Mr. Vieten, though.
Q. She was in a police vehicle?
A. Yes, sir.
Q. Now you've indicated that you -- your vehicle on

that occasion was a truck?
A. Yes, sir.
Q. Was Miss Hudson in the vehicle with you?
A. That's what I'm trying to remember.
I don't recall. I think she was in one of the trucks which would have been either my Dodge or Detective Smith's Dodge or Detective Briggs' Ford, but I don't recall which one.
Q. Okay. Now did you approach the truck that Mr. Vieten was operating prior to them getting out or being removed from that truck?
A. Walked up to the truck and I don't recall if I said -- asked Mr. Vieten out or if Mr. Vieten was stepping out as I approached him.
Q. Now you testified about this strong odor and that you detected when you got to the residence and the overpowering odor that you detected when the door to that residence was opened; correct?
A. Yes, sir.
Q. Did you detect any telltale or similar odors on either Miss Hudson or Mr. Vieten?
A. No, I would have noted them.
Q. Okay. Now have you any idea, Corporal, when Miss Hudson arrived at the Vieten farm on that particular day?

89

A. No, sir. She would not make any statements.
Q. But other than her having perhaps told you you don't know when she got there?
A. No, sir, I do not.

Q. You don't know if she had ever been in the house that day?
A. Just to clarify. On that day she made no statements and I had no -- at that time had no idea. However, after the October search warrant, then she clarified -- after the March search warrant, then she clarified the October search warrant, so in October, no, sir, I had no idea.
Q. Okay. So when you met her on the road, you don't know when she got there and you don't know if she had been in the house?
A. Correct.
Q. Now at some point and I -- a search was obtained for the residence after the place had been cleared out?
A. Yes, sir.
Q. Now do you know if photographs were taken of the inside of the house or just items seized?
A. Without reviewing all of the digital photographs taken that day, it's our common practice to remove all of the items from the residence for processing



outside the contaminated zone and whether any pictures were taken inside.
I'm not sure at this time without reviewing the photographs.
Q. Now do you recall, sir, if any of the items that were removed and seized as evidence, if any of those items were dusted for fingerprints?
A. No, sir, they were.

Q. So you have no knowledge that any of those items had Miss Hudson's fingerprints on them?
A. That's a correct statement.
Q. Now on the second occasion that a search warrant was executed at the Vieten farm --
A. Yes, sir.
Q. -- is that occasion as I recall your testimony that Miss Hudson was found inside the residence?
A. Yes, sir.
Q. Now did you on that occasion enter the residence?
You've testified that --
A. Yeah, I don't believe -- no. In fact, I was on outside perimeter on that occasion also.
Q. So when you first encountered Miss Hudson she was outside of the residence?
A. Yes.



Q. She had been --
A. She had been brought outside the residence, yes, sir.
Q. So you didn't have contact with her initially?
A. No, sir, I do not.
Q. One of other people in the search warrant?
A. Correct. Either Detective Blankenship or Deputy Geesler.
Q. Now at some point Miss Hudson was -- well, at some point after she was brought out you had conversation with her?
A. Yes, sir.

Q. And that was in a police vehicle?
A. Yes, sir.
Q. And I believe your testimony was that this was the occasion -- the occasion of this arrest was when what you believed to have been a syringe of methamphetamine was found in her purse?
A. Yes, sir.
Q. When she came out of the house, did she have her purse or did -- was her purse brought out by one of the other officers?
A. It was located in the house during the search. She did not bring it out with her.
Q. Okay. Do you recall where in the house it was?



In the kitchen where she had been?
A. I do not know. It was -- whether it was in the kitchen or the living room, sir.
Q. Now do you recall if that syringe was ever dusted for prints?
A. It was not.
Q. When you -- did you see the purse on that occasion?
A. Once it was brought out. Once it was brought outside, yes, sir.
Q. So you first see the purse, it's not in her custody?
A. Correct.
Q. Now there's no way to lock her purse, is there?
A. No, sir.
Q. Now she, according to your testimony, gave you

an initial statement which included information that she didn't want to talk to you there at scene?
A. She -- correct. She gave me information that led me to believe that she was being honest and truthful but she was visibly and telling me that she was scared that Mr. Vieten would find out she was talking about him.
Q. Now how did she appear to you to be scared?
A. She was crying.



Q. Was she very upset or just crying? Was she --
A. She was sobbing but she wasn't wailing. She was sobbing and doing it quietly so that -- Mr. Vieten was located in a vehicle in front of her, she was genuinely upset and didn't want Mr. Vieten to know that she was speaking with us.
Q. Do you recall if it appeared that from where Mr. Vieten was he could see inside the vehicle where you and Miss Hudson were?
A. No. She was in the vehicle behind his vehicle. I mean I guess if he looked over his shoulder he could see.
Q. But otherwise if he was facing straight ahead, he would not have seen her in the vehicle?
A. Correct.
Q. Now at some point you all get back to the police department or the sheriff's office where the interview was conducted --
A. Yes, sir.
Q. -- you testified about?

A. Yes, sir.
Q. Who was present for the interview besides you and Miss Hudson?
A. That was it.
Q. No other officers?

•



A. Mr. Briggs may have come and gone from the interview, but I don't recall him being there.
Q. If he -- if he passed through was -- if he came into the room was he just passing through as opposed to actually being involved in the interview?
A. Correct. He would have just been listening, he wasn't asking any questions.
Q. Do you recall, sir, approximately how long this interview took or lasted?
A. Including the written portion, sir?
Q. Yes, sir.
A. I would say at least an hour if not longer.
Q. Okay. And prior -- just the part with you questioning her or talking to her?
A. Twenty.
Q. Would have been an hour or less than that?
A. That would have been less than an hour.
Q. Do you recall, sir, if Miss Hudson was allowed out of the room to go to the bathroom or needed to while this was going on if she indicated?
A. She would have indicated, she would have been allowed to. I don't recall that she did.
Q. Did you provide her with anything to drink or did she ask for anything to drink as you recall?

A. I always offer a soda. I don't know if she took



the offer or not.
Q. Now you testified in response to other cross-examination that the residents near the Vieten farm had been asked to write down the license plate numbers of cars that might have been visiting the Vieten farm. Correct?
A. Yes, sir.
Q. Do you recall, sir, if there was a listing of any vehicles registered to Miss Erica Hudson?
A. I do not recall, but I do not believe there was.
Q. Do you recall, sir, from any of the videotapes that you testified in earlier cross-examination whether any of those videotapes showed Miss Erica Hudson in --
A. I do not believe so.
MR. WITHERSPOON: If I might have a moment, Your Honor.
That's all I have, Your Honor. Thank you.
THE COURT: Thank you.
Mr. Delworth, anything else?
MR. DELWORTH: I have no further questions of this witness and I have no further evidence.
I would move for the admissions of Exhibits 1, 2, 2-A, 3, 4 and 5 for purposes of this hearing.
THE COURT: Okay. Any objection to those

exhibits by anybody?
MS. TROG: No, Your Honor.
MR. WITHERSPOON: No, Judge.
THE COURT: Great. Make sure I get those before you leave.
MR. DELWORTH: Yes, sir.
THE COURT: Any evidence on behalf of Mr. Vieten, Mr. Radefeld?
MR. RADEFELD: Your Honor, actually what I --
THE WITNESS: Can I step down?
THE COURT: Yeah, you can step down. I'm sorry.
MR. RADEFELD: Your Honor, I had planned on calling Mr. Noel Vieten. There are a group of photographs, he would get on the stand and testify that they are fair and accurate description of what the property looks like on October 10th of 2002 and March 14th of 2003 and for judicial efficiency, if -- I don't know if the gentleman was willing to agree to just showing the Court what these photographs look like.
MR. DELWORTH: I have no objection, Your Honor, the --
THE COURT: That was the sole purpose of

97

your client's testimony?
MR. RADEFELD: Mr. Noel Vieten, the father.
THE COURT: I see.
MR. DELWORTH: The father.

MR. RADEFELD: And I do anticipate putting Mr. Benjamin Vieten on to testify as also --

THE COURT: Fine. What exhibits are this?

MR. RADEFELD: They are listed as Exhibit A through O and they are pictures of the Vieten property.

THE COURT: Okay. Be so admitted.

Does that include -- I guess that includes I that Miss Trog used?

MR. RADEFELD: Yes, it does, Your Honor.

THE COURT: All right. Thank you.

MS. TROG: Excuse me, Your Honor.

May we approach for just a moment before Mr. Vieten begins, please?

THE COURT: Sure.

(The following conference was held at the bench:)

(A portion of the bench conference was not audible.)

MS. TROG: I don't mind if she is not here and she doesn't mind if she's not here, but if she



could be excused, she's a little bit of discomfort right now.

THE COURT: Yes, so long as you're waiving your right, client's right to --

MS. TROG: Yes.

THE COURT: -- appearance in the courtroom while the testimony goes on.

MS. TROG: Yes.

THE COURT: Fine.

Any objection, I should have asked?

MR. RADEFELD: No objection.

THE COURT: Thanks.

(Proceedings resumed before in open court as follows:)

MR. RADEFELD: May I have a second please, Your Honor?

THE COURT: Sure.

Ready to go here, Mr. Radefeld?

MR. RADEFELD: Yes, Your Honor. I'm just advising my defendant, my client of his rights.

THE COURT: Okay. Well, let's proceed.

MR. RADEFELD: Yes.

THE COURT: Should have heard them before the start. Let's go.

MR. RADEFELD: Nothing further at this time.



THE COURT: You are not -- okay. I'm sorry.

You were trying to decide whether or not your client wanted to testify. Is that what you're saying?

MR. RADEFELD: That's what I was trying to say, Your Honor.

THE COURT: Okay.

MR. RADEFELD: After talking to the U.S. attorney there --

THE COURT: You've chosen not to.

MR. RADEFELD: Chose not to.

THE COURT: Fair enough.

Any evidence on behalf of Miss Blum?

MS. TROG: None on behalf of Miss Blum.

THE COURT: Okay. Miss Blum's not here but that's by her consenting.

MS. TROG: This is correct, Your Honor.

THE COURT: All right. And any evidence on behalf of Erica Hudson?

MR. WITHERSPOON: Miss Hudson is present, Your Honor, and we would adduce no evidence at this time.

THE COURT: All right. The Court will take

•

100

all of the testimony under submission.

I've got all the government's exhibits here --

MR. DELWORTH: Yes.

THE COURT: -- 1 through 5 and all the photographs which were in without objection from the government; is that right?

MR. DELWORTH: That's what I understand, Judge.

THE COURT: Anything else?

Am I missing something here?

MR. DELWORTH: No, no, Your Honor.

THE COURT: Great. Court will take all of this under submission.

Thank you all.

(Recess.)

•



CERTIFICATE

I, Lynne Shrum, do hereby certify that I am a duly appointed official court reporter for the United States District Court for the Eastern District of Missouri.

I further certify the foregoing is a true and accurate transcription as heard and understood from the taped proceedings held in the above-entitled case and has been transcribed from said tape to the best of my ability.

This reporter does not certify any transcript nor takes any responsibility for missing or damaged pages of this transcript when said transcript is copied and delivered by any party other than this reporter.

------------------          ------------------------

Date __ /s/ Lynne Shrum

•